THOMAS H. CLARKE, JR. (SBN 47592)
TIMOTHY A. DOLAN (SBN 209674)
ROPERS, MAJESKI, KOHN & BENTLEY
201 Spear Street, Suite 1000
San Francisco, CA 94105
Telephone:    (415) 543-4800
Facsimile:    (415) 972-6301
tclarke@rmkb.com
tdolan@rmkb.com

Attorneys for Plaintiff
MOSS LANDING COMMERCIAL PARK LLC

COPY

ADR

ORIGINAL
FILED

NOV 3 0 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

E-FILING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

MOSS LANDING COMMERCIAL PARK LLC,

Plaintiff,

v.

KAISER ALUMINUM CORPORATION, KAISER ALUMINUM AND CHEMICAL CORPORATION, and DOES 1 through 100,

Defendants.

CASE NO. C07 06072 RMW PVT

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- CWA 1365(a)(1)(A)
- RCRA 6972(a)(1)(B)
- Continuing Public Nuisance & Public Nuisance Per Se
- Continuing Private Nuisance & Private Nuisance Per Se
- Negligence Per Se
- Declaratory Relief
- Equitable Indemnity & Contribution
- Section 1428 C.C.
- Breach of contract

DEMAND FOR JURY TRIAL

## JURISDICTION AND VENUE

1.     This court has subject matter jurisdiction under 28 U.S.C. section 1331, in that this case arises under the laws of the United States, 42 U.S.C. section 6972, 33 U.S.C. section 1365, and 28 U.S.C. sections 2201 and 2202.

2.     The court has supplemental jurisdiction under 28 U.S.C. section 1367(a) in that the state law claims of plaintiff MOSS LANDING COMMERCIAL PARK LLC ("MLCP") are so related to the claims over which the Court exercises original jurisdiction that they form part of the

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    same case or controversy under Article III of the United States Constitution.

2        3.    Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391(b, c)

3    and 42 U.S.C. section 6972(c) because the events giving rise to the claims of MLCP occurred

4    within the District, because the property which is the subject of the action is situated within the

5    District, and because defendants KAISER ALUMINUM CORPORATION and KAISER

6    ALUMINUM & CHEMICAL CORPORATION (hereinafter jointly referred to as "KACC")

7    conducted activities within the District giving rise to the claims of MLCP.

8        4.    On November 30, 2007, MLCP served a Notice Letter on KACC regarding the

9    violations of Clean Water Act ("CWA") and Resource Conservation and Recovery Act

10   ("RCRA"), as set forth herein, and the intention of MLCP to file suit against KACC. Copies of

11   the Notice Letter were sent to the Administrator of the U.S. Environmental Protection Agency

12   ("EPA"), the Regional Administrator of EPA Region IX, the Executive Director of the State

13   Water Resources Control Board ("SWRCB"), the Executive Office of the Central Coast Regional

14   Water Quality Control Board ("RWQCB"), the Secretary of the California Environmental

15   Protection Agency ("Cal-EPA"), the Director of the California Department of Toxic Substances

16   Control ("DTSC"), and the Chairman and Executive Officer of the California Integrated

17   Management Board ("IWMB") as required by 33 U.S.C. section 1365(b)(1) and 42 U.S.C. section

18   6972(b)(1). On information and belief MLCP alleges that the CWA actions set forth herein

19   involve toxic pollutants within the meaning of 33 U.S.C. sections 1365(b) and 1317(a) and also

20   that the RCRA actions set forth herein involve "subchapter III" violations (aka Subtitle C of the

21   Act, 42 U.S.C. sections 6921 et seq.).

22       5.    Neither EPA nor any agency of the State of California has commenced or is

23   diligently prosecuting an action to redress the violations of the CWA alleged in the Notice Letter.

24   Claims for civil penalties asserted in this action are not barred by any prior administrative penalty

25   under section 309(g) of the CWA, 33 U.S.C. section 1319(g).

26       6.    Neither EPA nor any agency of the State of California has commenced or is

27   diligently prosecuting an action to redress the violations of RCRA alleged in the Notice Letter.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1   Neither EPA nor any agency of the State of California is engaging in a removal action pursuant to

2   42 U.S.C. section 9604.  Neither EPA nor any agency of the State of California has incurred costs

3   to initiate a Remedial Investigation and Feasibility Study pursuant to 42 U.S.C. section 9604, or

4   is diligently proceeding with a remedial action pursuant to 42 U.S.C. sections 9601 et seq.  EPA

5   has not obtained a court order or issued an administrative order pursuant to 42 U.S.C. section

6   9606 or 42 U.S.C. section 6973 pursuant to which a responsible party is diligently conducting a

7   removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial

8   action.

9                                    **INTRADISTRICT ASSIGNMENT**

10          7.      Intradistrict assignment of this matter to the San Jose Division of this Court is

11  appropriate pursuant to Civil Local Rule 3-2(c,e).  The events, action, and omissions which give

12  rise to the claims of plaintiff MLCP occurred in Monterey County, and the property at issue is

13  located in Monterey County.

14                                        **THE PARTIES**

15          8.      Plaintiff MLCP is a California LLC with its headquarters and principal place of

16  business located at 7695 Highway 1, Moss Landing, CA 95039.

17          9.      Defendant Kaiser Aluminum & Chemical Corporation is a Delaware corporation

18  with its headquarters located at 27422 Portola Pkwy., Ste. 350, Foothill Ranch, CA 92610-2831

19  and its principal place of business located at 5847 San Felipe St., Suite 2500, Houston, TX

20  71326-3777.  At all times relevant, Kaiser Aluminum & Chemical Corporation has been and is a

21  wholly owned subsidiary of Kaiser Aluminum Corporation.  One hundred percent of the equity of

22  Defendant Kaiser Aluminum & Chemical Corporation is owned by Defendant Kaiser Aluminum

23  Corporation; on information and belief, MLCP alleges that all officers and directors of Kaiser

24  Aluminum & Chemical Corporation are officers and directors of Kaiser Aluminum Corporation.

25          10.     Defendant Kaiser Aluminum Corporation is a Delaware corporation with its

26  headquarters and principal place of business located at 27422 Portola Pkwy., Ste. 350, Foothill

27  Ranch, CA 92610-2831.  Defendant Kaiser Aluminum Corporation is the parent of Defendant

28  USDC NDCA No.
    RCI/5033579.1/CB12                         - 3 -                    COMPLAINT FOR DAMAGES AND
                                                                              INJUNCTIVE RELIEF

1  Kaiser Aluminum & Chemical Corporation and owns 100% of its equity; Defendant Kaiser

2  Aluminum & Chemical Corporation is a subsidiary of Defendant Kaiser Aluminum Corporation.

3  On information and belief, MLCP alleges that all of the acts and omissions of Defendant Kaiser

4  Aluminum & Chemical Corporation, as alleged herein, were done at the request or direction of

5  Defendant Kaiser Aluminum Corporation, were done as a matter of corporate policy established

6  by Defendant Kaiser Aluminum Corporation, or were ratified or approved after-the-fact by

7  Defendant Kaiser Aluminum Corporation. MLCP alleges that Defendant Kaiser Aluminum

8  Corporation did aid, abet, and encourage and has contributed to the creation, existence, or

9  maintenance of the two dumps, as noted herein, that contain hazardous waste and create and have

10  created toxic soil and water pollutants and contaminants, as noted herein. MLCP further alleges

11  that Defendant Kaiser Aluminum Corporation did aid, abet, and encourage and has contributed to

12  the creation, existence, and maintenance of the imminent and substantial danger to the

13  environment posed by the two dumps even after being on notice of the hazardous and toxic nature

14  of the dumps and their effluent following the 1978 release of chromium contaminated leachate, as

15  noted herein, and was and is additionally reflected in the written statement made to EPA in 1981

16  that the two dumps may contain hazardous waste.

17      11.    On information and belief MLCP alleges that Defendants DOES 1 through 100 did

18  act or failed to act in a manner that aided, abetted, and encouraged and has contributed to the

19  creation, existence, or maintenance of the two dumps, the toxic soil and water pollutants and

20  contaminants noted herein, and the imminent and substantial endangerment created thereby. The

21  true names of DOES 1 through 100 are unknown to MLCP at this time. When their identities are

22  ascertained, the complaint shall be amended to reflect their true names.

23                    **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

24      12.    The property impacted by the discharges, releases, hazardous wastes, and toxic

25  pollutants described herein is located adjacent to Highway 1, Dolan Road, and Moro Cojo

26  Slough. See Exhibit A attached hereto. The property is comprised of approximately 200 acres

27  and is further described by Assessor's Parcel Numbers 131-054-008, 133-173-002, 133-172-004,

28  

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

USDC NDCA No.
RCI/5033579.1/CB12                    - 4 -                    COMPLAINT FOR DAMAGES AND
                                                             INJUNCTIVE RELIEF

1    and 133-172-013. Hereinafter this site is referred to as "The Property". MLCP is the current

2    owner of The Property.

3        13.    Immediately across Highway 1 to the west of The Property is the Moss Landing

4    Harbor, which is directly connected to Monterey Bay. See Exhibit A. Monterey Bay is part of

5    the Monterey Bay National Marine Sanctuary. See Exhibit B attached hereto for a map showing

6    the boundaries of the Sanctuary. The Moro Cojo Slough also runs into the Moss Landing Harbor.

7    See Exhibit A. The groundwater gradient for the shallow groundwater immediately beneath The

8    Property is generally to the West and also to the South, toward the Harbor and Monterey Bay on

9    the one hand and toward the Moro Cojo Slough on the other.

10        14.    During World War II (starting in 1942) and thereafter until 1985, KACC

11    established, built, owned, and operated various industrial operations at The Property. Initially

12    KACC constructed various facilities for the production of magnesium oxide for magnesia metal

13    production at a nearby plant located in Permanente, California. After World War II this market

14    ceased, and starting in approximately 1946 operations at The Property were converted to a

15    magnesia plant and a refractory plant for the production of magnesium oxide, production of

16    products containing magnesium oxide, and production of refractory brick. The production of

17    refractory (or high-temperature tolerant) brick involved the use of chromite ore as an input to the

18    process. Chromite ore is a brownish-black mineral that is a major source of chromium.

19        15.    During these operations, KACC and DOES 1-100 created two dumps on The

20    Property, referred to as Landfill #1 and Landfill #2. See Exhibit C hereto. These so-called

21    landfills do not meet modern standards for landfills. The two dumps were used for many decades

22    and were the depository for a wide variety of waste products, including (without limitation) used

23    refractory linings from kilns, materials from the clean-up of spills of chromite ore, periclase (the

24    cubic form of magnesium oxide), magnesium oxide, dolomite, plant sweepings from various

25    spills, and dusts from baghouse dust collectors.

26        16.    In a 1981 filing with EPA, KACC notes that in 1978 chromium-contaminated

27    leachate was being released and discharged from Landfill #1 and running into a ditch along Dolan

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    Road (see Exhibit A). Thereafter, the top of Landfill #1 was paved and allegedly no more wastes

2    were deposited therein. The 1981 filing notes that a collection drain pipe was also installed "at

3    the base of the pile for collection of the leachate being produced from the pile." Landfill #2 then

4    allegedly, according to the filing, became the sole dump at The Property for land filling wastes.

5    (See Exhibit C for a diagram from the 1981 filing with EPA by KACC showing the location of

6    the two dumps.) KACC notes in the 1981 filing that materials containing soluble chromium

7    compounds were deposited in the two dumps. Landfill #2 was allegedly closed in 1980. MLCP

8    believes that Landfill #2 has only a permeable gravel cap, and that one or more collection drain

9    pipes were also installed at the base of Landfill #2 for the collection of leachate and its

10   conveyance into the swampland adjacent thereto. The two dumps contain only highly permeable

11   dirt sides which allow the infiltration of rainwater and the exfiltration of leachate from the dumps.

12   Further, the dumps contain no liners or other physical impediments on the bottom aspect of the

13   dumps to prevent the infiltration of groundwater or the movement of leachate from within the

14   dumps into the groundwater.

15        17.    In the 1981 filing with EPA, KACC notes that the dumps "may contain material

16   that would be defined by the EPA today as hazardous waste." On information and belief, MLCP

17   alleges that between 1980 and its sale of The Property in 1985 KACC took no steps to assess

18   whether discharges or releases from the two dumps were having an adverse impact on the

19   environment, including whether they were causing contamination of surface or ground waters.

20   MLCP further alleges that KACC did not undertake any steps to obtain an NPDES permit for any

21   of the drain pipes that were placed within the dumps or for the drainage ditches and culverts about

22   the dumps, or to establish any treatment systems for leachate that was exiting the dumps into the

23   environment through said conveyances.

24        18.    On information and belief, MLCP alleges that the wastes contained within the

25   two dumps known as Landfill #1 and Landfill #2 are a hazardous waste within the meaning of

26   "subchapter III" of RCRA (aka Subtitle C of the Act, 42 U.S.C. sections 6921 et seq.) and 42

27   C.F.R. § 261.3. MLCP further alleges that the wastes contained in the two dumps are California

28

USDC NDCA No.
RC1/5033579.1/CB12

- 6 -

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

hazardous wastes.

19.     Monitoring wells across The Property have established the continuing, ongoing release and discharge of toxic and other pollutants from the dumps, and the presence of hexavalent chromium, antimony, lead, and nickel in the groundwater at concentrations well above the drinking water levels established under California and Federal law.  These drinking water standards are known as the maximum contaminant level ("MCL"); in the case of lead, it is known as an "action level" ("AL").  The adverse health impacts of chrome compounds, antimony, lead, and nickel upon humans are set forth in Exhibit D (monograms by the Department of Health & Human Services, Agency for Toxic Substances and Disease Registry).

20.     Three of the many monitoring wells on The Property in which hexavalent chromium, antimony, and nickel have been detected are immediately across Highway One from the Moss Landing Harbor, and thus only several hundred feet from the Moss Landing Harbor. Hexavalent chromium levels at various monitoring wells at the site have varied over time up to a maximum of 673 ppb (micrograms per liter); antimony levels, to a maximum of 51 ppb; nickel levels, to a maximum of 679 ppb; and, lead levels, to a maximum of 58 ppb.  The plume of these metals (hexavalent chromium, lead, antimony, and nickel) is moving across The Property from the dumps toward Moss Landing Harbor and the Moro Cojo Slough. The MCL for chrome is based on "total chrome", of which hexavalent chromium is but one component; the California MCL is 50 ppb, and the EPA MCL is 100 ppb.  The California and EPA MCL for antimony is 6 ppb; for nickel, 100 ppb.  The California and EPA AL for lead is 15 ppb.  Hexavalent chromium, lead, antimony, and nickel are each a toxic pollutant within the meaning of 33 U.S.C. sections 1365(b) and 1317(a).

21.     On information and belief, MLCP alleges that the adversely impacted groundwater beneath The Property is recharging and adversely impacting nearby surface water, including Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property.    Further, MLCP alleges that waste-containing soils, soils contaminated by the discharge and release of hexavalent chromium and other metals from the dumps, and the waste

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  itself are eroding into nearby surface waters and are moving downward into groundwater and also

2  moving through ditches and channels on The Property and off The Property to impact nearby

3  surface and ground waters, including Monterey Bay, Moss Landing Harbor, Moro Cojo Slough,

4  and the swamplands in and about The Property.

5        22.    The RWQCB has adopted the September 8, 1994 Water Quality Control Plan

6  ("Basin Plan") for Central Coast groundwater. The Basin Plan mandates that all Central Coast

7  groundwater, except the Soda Lake Sub-Basin (which is not applicable herein), has a beneficial

8  use as drinking water. As such, the MCLs determine whether groundwater meets the criteria of

9  the Basin Plan. The discharges and releases from the dumps impair the drinking water beneficial

10  use of the groundwater.

11        23.    The Basin Plan also states that the beneficial uses of Moro Cojo Slough adjacent to

12  The Property includes, without limitation, cold and warm fresh water habitat, and applies the

13  chromium MCL standard to those uses. MLCP alleges on information and belief that the

14  discharges and releases from the dumps impair these beneficial uses of the Moro Cojo Slough.

15        24.    The discharge of wastes without a permit into the waters of the State of California

16  is a violation of the prohibitions contained in the Basin Plan, and creates, or threatens to create, a

17  condition of degradation, nuisance, pollution, and contamination as defined by the California

18  Water Code.

19        25.    The financial and ownership interests in The Property of MLCP and its members

20  and managers has been impaired and degraded by the contaminant conditions noted herein. The

21  contaminant conditions have exposed them to enforcement actions by regulatory agencies and

22  caused them to incur costs and expenses.

23        26.    In December, 1984 KACC sold The Property with improvements thereon to

24  National Refractories & Minerals Corporation ("NFMC"). In December, 2003 NFMC sold The

25  Property with improvements thereon to MLCP. As part of the KACC-NFMC transaction, KACC

26  and NFMC entered into an Agreement on Environmental Compliance. See Exhibit E. On

27  information and belief, MLCP alleges that the Agreement on Environmental Compliance was

28

USDC NDCA No.
RC1/5033579.1/CB12

     - 8 -

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1   assigned to MLCP as part of its 2003 transaction with NFMC.

2   **FIRST CLAIM FOR RELIEF**

3   **Violation of Duty to Apply for a NPDES Permit in Violation of the Clean Water Act Alleged**
    **Against KACC and DOES 1-100**
4   **(Violations of 33 U.S.C. §§ 1311, 1342)**

5   27.     MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive,

6   as though fully set forth herein.

7   28.     33 U.S.C. section 1365(a)(1)(A) provides that any citizen may commence a civil

8   action on his, her, or its own behalf against any "person" alleged to be in violation of an effluent

9   standard or limitation under the CWA.  KACC is a "person" as defined by 33 U.S.C. section

10  1362(5).

11  29.     33 U.S.C. section 1311(a) states: "Illegality of pollutant discharges except in

12  compliance with law. Except as in compliance with this section and sections 302, 306, 307, 318,

13  402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful."

14  30.     The CWA prohibits the discharge of a pollutant to waters of the United States

15  without an NPDES permit. 33 U.S.C. section 1342.  At no time relevant herein has KACC

16  applied for or obtained an NPDES permit for the collection drain pipes that convey contaminated

17  leachate from the dumps or for the ditches and culverts that convey contaminated leachate, waste-

18  containing soils, soils contaminated by the discharge and release of hexavalent chromium and

19  other metals from the dumps, and the waste itself related to the dumps.

20  31.     KACC and DOES 1-100 have discharged and continue to permit to discharge toxic

21  pollutants from the dumps to waters of the United States since at least October, 1980.

22  32.     KACC and DOES 1-100 have been in violation of 33 U.S.C. section 1311(a) due

23  to its failure to submit an application for an NPDES permit for its discharges and releases from

24  the dumps to the waters of the United States every day since at least October, 1980.

25  33.     KACC and DOES 1-100 will continue to be in violation of 33 U.S.C. section 1311

26  each day that it fails to submit an application for an NPDES permit pursuant to 33 U.S.S. section

27  1342.

28  USDC NDCA No.
    RCI/5033579.1/CB12                        - 9 -                    COMPLAINT FOR DAMAGES AND
                                                                       INJUNCTIVE RELIEF

*Ropers Majeski Kohn & Bentley*
*A Professional Corporation*
*San Francisco*

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    34.    Failure to submit an application for an NPDES permit is an ongoing violation of

2    the CWA.

3    35.    Each day that KACC and DOES 1-100 allow the dumps to release and discharge

4    pollutants as noted herein without submitting an application for an NPDES permit for the

5    discharge of pollutants to waters of the United States is a separate and distinct violation of 33

6    U.S.C. section 1311(a).

7    36.    An action for relief under the CWA is authorized by 33 U.S.C. section 1365(a).

8    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to forthwith obtain an NPDES

9    permit for the dumps, as noted herein, and to implement such pollution control requirements as

10   are mandated by said NPDES permit.  Further, MLCP seeks an injunction requiring KACC to

11   characterize and remediate the toxic pollutants and contamination that has resulted from its

12   violation of sections 1311(a) and 1342.  The acts and omissions of KACC and DOES 1-100 are

13   ongoing and continuous and, if allowed to continue, do and will irreparably harm MLCP.

14   37.    MLCP seeks the imposition of civil penalties pursuant to 33 U.S.C. section 1319

15   in light of the historical and ongoing violations of 33 U.S.C. sections 1311 and 1342 by KACC

16   and DOES 1-100 stretching over a period in excess of 2½ decades to the present.

17   38.    MLCP seeks an award of its costs, including reasonable attorney's fees and expert

18   witness fees, pursuant to 33 U.S.C. section 1365(d).

19   **SECOND CLAIM FOR RELIEF**

20   **Unpermitted Discharge of Pollutants to Waters of the United States in Violation of the
     Clean Water Act Alleged Against KACC and DOES 1-100**

21   **(Violations of 33 U.S.C. §§ 1311, 1342)**

22   39.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive,

23   as though fully set forth herein.

24   40.    33 U.S.C. section 1365(a)(1)(A) provides that any citizen may commence a civil

25   action on his, her, or its own behalf against any "person" alleged to be in violation of an effluent

26   standard or limitation under the CWA.  KACC and DOES 1-100 are a "person" as defined by 33

27   U.S.C. section 1362(5).

28   USDC NDCA No.
     RCI/5033579.1/CB12                              - 10 -                    COMPLAINT FOR DAMAGES AND
                                                                                    INJUNCTIVE RELIEF

41.    33 U.S.C. section 1311(a) states: "Illegality of pollutant discharges except in compliance with law. Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful."

42.    KACC and DOES 1-100 have discharged and continue to discharge pollutants from the dumps, from groundwater that discharges into surface waters (including Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property), and from surface waters that discharge into groundwater, Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property, as noted herein.

43.    KACC and DOES 1-100 have been in violation of 33 U.S.C. section 1311(a), due to its discharges of pollutants every day since at least October, 1980.  The violation is ongoing.

44.    KACC and DOES 1-100 will continue to be in violation of 33 U.S.C. section 1311(a) each day KACC and DOES 1 through 100 allow the release and discharge pollutants to waters of the United States without an NPDES permit.

45.    The failure of KACC and DOES 1-100 to obtain an NPDES permit for the discharge of pollutants noted herein is an ongoing violation of 33 U.S.C. section 1342.

46.    Each day that KACC and DOES 1-100 allow the discharge of pollutants, as noted herein, and fails to obtain an NPDES permit, as noted herein, is a separate and distinct violation of 33 U.S.C. sections 1311 and 1342.

47.    An action for relief under the CWA is authorized by 33 U.S.C. section 1365(a). MLCP seeks injunctive relief requiring KACC and DOES 1-100 to forthwith obtain an NPDES permit for the dumps, as noted herein, to implement such pollution control requirements as are mandated by said NPDES permit, and to cease all discharges and releases of pollutants in violation of 33 U.S.C. section 1311(a).  Further, MLCP seeks an injunction requiring KACC to characterize and remediate the toxic pollutants and contamination that has resulted from its violation of sections 1311(a) and 1342.  The acts and omissions of KACC and DOES 1-100 are ongoing and continuous and, if allowed to continue, do and will irreparably harm MLCP.

48.    MLCP seeks the imposition of civil penalties pursuant to 33 U.S.C. section 1319

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  in light of the historical and ongoing violations of 33 U.S.C. sections 1311 and 1342 by KACC

2  and DOES 1-100 stretching over a period in excess of 2½ decades to the present.

3      49.    MLCP seeks an award of its costs, including reasonable attorney's fees and expert

4  witness fees, pursuant to 33 U.S.C. section 1365(d).

5  <u>**THIRD CLAIM FOR RELIEF**</u>

6  <u>Creation of an Imminent and Substantial Endangerment to the Environment Alleged</u>
   Against KACC and DOES 1-100
7  **(Violations of 42 U.S.C. § 6972(a)(1)(B))**

8      50.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive,

9  as though fully set forth herein.

10      51.    42 U.S.C. section 6972(a)(1)(B) provides that any "person" may commence a civil

11  action on his, her, or its own behalf against any "person" alleged to be a past generator or

12  transporter who has contributed to the disposal of any solid or hazardous waste which presents an

13  imminent and substantial endangerment to the environment. MLCP, KACC, and DOES 1

14  through 100 are each a "person" as defined by 42 U.S.C. section 6903(15).

15      52.    KACC and DOES 1-100 are both a past generator and a past transporter that has

16  contributed to the disposal of solid and hazardous waste which presents an imminent and

17  substantial endangerment to the environment, as noted herein. Further, by their acts and

18  omissions KACC and DOES 1-100 have contributed to the creation of an imminent and

19  substantial endangerment to the environment, as noted herein. The releases and discharges from

20  the dumps constitute a disposal of both a solid and hazardous waste as described by 42 U.S.C.

21  sections 6903(3), 6903(5)(B), and 6903(27).

22      53.    The adverse impacts to soil, surface water, and groundwater from the discharges

23  from the dumps presents an imminent and substantial endangerment to the environment, as noted

24  herein, including The Property.

25      54.    Additionally, the migration of the wastes and the impacted soils, surface waters,

26  and groundwaters, as noted herein, pose an imminent and substantial endangerment to Monterey

27  Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property.

28  USDC NDCA No.
   RCI/5033579.1/CB12              - 12 -                COMPLAINT FOR DAMAGES AND
   INJUNCTIVE RELIEF

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

55.    MLCP seeks injunctive relief from the ongoing imminent and substantial endangerment which requires KACC and DOES 1-100 to forthwith characterize and remediate the contamination, including without limitation removing the two dumps from The Property.  The presence of unconfined and uncontrolled hazardous waste, as well as the leaching, discharges, and releases as noted herein, will irreparably harm MLCP and further harm the environment, including biota upon and ground and surface waters of The Property, Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property.

56.    MLCP seeks the imposition of civil penalties pursuant to 42 U.S.C. section 6928(g) in light of the historical and ongoing creation of an imminent and substantial endangerment to the environment by and DOES 1-100 over a period in excess of 2½ decades to the present.  KACC and DOES 1-100 have been on notice since 1978, as noted in its filing with EPA in 1981, that contaminated leachate from the dumps can escape and poses an imminent and substantial threat to the environment.

57.    MLCP seeks an award of its costs, including reasonable attorney's fees and expert witness fees, pursuant to 42 U.S.C. section 6972(e).

## FOURTH CLAIM FOR RELIEF

### Continuing Public Nuisance and Public Nuisance Per Se Alleged Against KACC and DOES 1-100

58.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive, as though fully set forth herein.

59.    In permitting and continuing to permit the release and discharge of pollutions and contaminants into the soil, surface water, and groundwater, as noted herein, KACC and DOES 1-100 have created a condition that is harmful to health, offensive to the senses, and an obstruction to the free use and enjoyment of property and the waters of the State.  The conduct of KACC and DOES 1-100 was and is unreasonable.

60.    In doing the acts and omissions alleged herein, KACC and DOES 1-100 violated and failed to comply with statutes, ordinances, and regulations of public entities and agencies

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1   relating to health, safety, and environmental protection.

2        61.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100

3   violated and continue to violate State law, including but not limited to Section 5411 of the

4   California Health & Safety Code. Section 5411 is, and at all times was, valid, in effect, and

5   applicable to the dumps created by KACC and DOES 1-100; pursuant to Section 5461, violation

6   of 5411 is a misdemeanor.

7        62.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100

8   violated and continue to violate State law, including but not limited to Sections 370 and 371 of

9   the California Penal Code. Sections 370 and 371 are, and at all times were, valid, in effect, and

10  applicable to the dumps created by KACC and DOES 1-100; pursuant to Section 372, violation of

11  Section 370 is a misdemeanor.

12       63.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100

13  violated and continue to violate Federal law, including but not limited to 33 U.S.C. sections

14  1311(a) and 1345. Sections 1311 and 1345 are, and at all times were, valid, in effect, and

15  applicable to the dumps, releases, and discharges created by KACC; pursuant to 33 U.S.C. section

16  1319(c), violation of either section 1311 or 1345 is a felony. KACC and DOES 1-100 were on

17  notice as a result of the 1978 release of chromium contaminated leachate that ongoing releases

18  could be reasonably anticipated, and that its failure to obtain an NPDES permit would allow such

19  releases to continue in the future.

20       64.    The pollution and contaminants created or abetted by KACC and DOES 1-100 not

21  only adversely impacts MLCP but also the People of the State of California who own all surface

22  water and groundwater, including the groundwater beneath and surface water of The Property,

23  Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The

24  Property, pursuant to §§ 102 and 104 Water Code.

25       65.    The seriousness of the resulting harm outweighs the social utility of the conduct of

26  KACC and DOES 1-100.

27       66.    MLCP's injury is separate and distinct from that of the public because

28

1   contaminants and pollutants impacting The Property are migrating in surface waters and

2   groundwater and have adversely impacted both the soils and the surface and ground waters of The

3   Property, and separately and independently because MLCP has expended monies to characterize

4   the contamination.

5       67.    The pollution causing the continuing nuisance can be abated at a reasonable cost.

6       68.    MLCP has not consented to the discharge of pollutants or contaminants into the

7   soil, surface waters, and groundwater of The Property.

8       69.    As a proximate cause of the continuing nuisance created by KACC and DOES 1-

9   100, MLCP has incurred costs and suffered damages, and will continue to incur costs and suffer

10  damages until the soil, surface waters, and groundwater of The Property are remediated.  MLCP

11  has incurred costs and expenses in an amount to be proven at trial; the amount incurred to date is

12  in excess of $1 million.

13      70.    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

14  cease all releases and discharges and forthwith characterize and remediate the contamination and

15  pollution.  The continued commission and omissions of the alleged acts by KACC and DOES 1-

16  100 will irreparably harm MLCP.  MLCP has no speedy or adequate remedy at law for this

17  irreparable harm.

18      71.    Because MLCP is in part benefiting the People of the State of California by

19  seeking remediation of surface water and groundwater owned by the People, and seeking to

20  benefit and prevent the further impairment of Monterey Bay, Moss Landing Harbor, Moro Cojo

21  Slough, and the swamplands in and about The Property, MLCP requests its attorney's fees

22  pursuant to Section 1021.5 C.C.P.

### FIFTH CLAIM FOR RELIEF

**Continuing Private Nuisance and Private Nuisance Per Se Alleged Against KACC and
DOES 1-100**

23

24

25      72.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive,

26  as though fully set forth herein.

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

73.    As a result of the acts and omissions of KACC and DOES 1-100 as set forth herein the soil, surface waters, and groundwater of The Property are now polluted and contaminated.

74.    The presence of pollutants and contaminants in the soil, surface water, and groundwater of The Property constitutes a continuing nuisance in that it is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life or property.

75.    The nuisance created by KACC and DOES 1-100 is substantial and unreasonably interferes with the use and enjoyment of The Property by MLCP.

76.    In permitting and continuing to permit the release and discharge of pollutions and contaminants into the soil, surface water, and groundwater, as noted herein, KACC and DOES 1-100 have created a condition that is harmful to health, offensive to the senses, and an obstruction to the free use and enjoyment of property.  The conduct of KACC and DOES 1-100 were and is unreasonable.

77.    In doing the acts and omissions alleged herein, KACC and DOES 1-100 violated and failed to comply with statutes, ordinances, and regulations of public entities and agencies relating to health, safety, and environmental protection.

78.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100 violated and continues to violate State law, including but not limited to Section 5411 of the California Health & Safety Code.  Section 5411 is, and at all times was, valid, in effect, and applicable to the dumps created by KACC and DOES 1-100; pursuant to Section 5461, violation of 5411 is a misdemeanor.

79.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100 violated and continues to violate Federal law, including but not limited to 33 U.S.C. sections 1311(a) and 1345.  Sections 1311 and 1345 are, and at all times were, valid, in effect, and applicable to the dumps, releases, and discharges created by KACC and DOES 1-100; pursuant to 33 U.S.C. section 1319(c), violation of either section 1311 or 1345 is a felony.  KACC and DOES 1-100 were on notice as a result of the 1978 release of chromium contaminated leachate that

1   ongoing releases could be reasonably anticipated, and that its failure to obtain an NPDES permit

2   would allow such releases to continue in the future.

3       80.   The injury of MLCP is separate and distinct from that of the public because

4   contaminants and pollutants impacting the soil of The Property and migrating in surface waters

5   and groundwater have impacted the soils, surface waters, and groundwater of The Property, and

6   separately and independently because MLCP has expended monies to characterize the pollution

7   and contamination. MLCP has incurred costs and expenses in an amount to be proven at trial; the

8   amount incurred to date is in excess of $1 million.

9       81.   The nuisance condition created by KACC and DOES 1-100 can be abated at a

10  reasonable cost.

11      82.   As a proximate cause of the continuing nuisance created by KACC and DOES 1-

12  100, MLCP has incurred costs and suffered damages, and will continue to incur costs and suffer

13  damages until the soil, surface waters, and groundwater of The Property are remediated. MLCP

14  has incurred costs and expenses in an amount to be proven at trial; the amount incurred to date is

15  in excess of $1 million.

16      83.   MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

17  cease all discharges and releases and forthwith characterize and remediate the contamination and

18  pollution. The continued commission and omissions of the alleged acts by KACC and DOES 1-

19  100 will irreparably harm MLCP. MLCP has no speedy or adequate remedy at law for this

20  irreparable harm.

21      84.   Because MLCP is in part benefiting the People of the State of California by

22  seeking remediation of surface water and groundwater owned by the People, and seeking to

23  benefit and prevent the further impairment of Monterey Bay, Moss Landing Harbor, Moro Cojo

24  Slough, and the swamplands in and about The Property, MLCP requests its attorney's fees

25  pursuant to Section 1021.5 C.C.P.

## SIXTH CLAIM FOR RELIEF

### Negligence Per Se Alleged Against KACC and DOES 1-100

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

85.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive, as though fully set forth herein.

86.    At all times KACC and DOES 1-100 had a duty to conduct their disposal operations associated with their manufacturing activities in such a manner so as to avoid discharging and releasing pollutants and contaminants into the soil, surface waters, and groundwater of The Property, and to immediately characterize and remediate any spills, releases, and discharges that occurred or occur.

87.    KACC and DOES 1-100 have failed to satisfy their duty.

88.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100 violated and continues to violate State law, including but not limited to Section 5411 of the California Health & Safety Code. Section 5411 is, and at all times was, valid, in effect, and applicable to the dumps created by KACC; pursuant to Section 5461, violation of 5411 is a misdemeanor.

89.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100 violated and continue to violate State law, including but not limited to Sections 370 and 371 of the California Penal Code. Sections 370 and 371 are, and at all times were, valid, in effect, and applicable to the dumps created by KACC and DOES 1-100; pursuant to Section 372, violation of 370 is a misdemeanor.

90.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100 violated and continues to violate Federal law, including but not limited to 33 U.S.C. sections 1311(a) and 1345. Sections 1311 and 1345 are, and at all times were, valid, in effect, and applicable to the dumps, releases, and discharges created by KACC and DOES 1-100; pursuant to 33 U.S.C. section 1319(c), violation of either section 1311 or 1345 is a felony. KACC and DOES 1-100 were on notice as a result of the 1978 release of chromium contaminated leachate that ongoing releases could be reasonably anticipated, and that its failure to obtain an NPDES permit would allow such releases to continue in the future.

91.    MLCP is among the class of entities for whom the statutes KACC and DOES 1-

100 violated were intended to protect.

92.    The damages and harm suffered by MLCP are the result of the statutory violations of KACC and DOES 1-100 and the statutes in question were intended to protect against the type of harm and damages that MLCP has suffered.

93.    As a proximate cause of the statutory violations by KACC and DOES 1-100, MLCP has incurred costs and suffered damage and harm, and will continue to incur costs and suffer damage and harm until the pollutants and contaminants adversely impacting the soil, surface waters, and groundwater of The Property, Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property are characterized and remediated. MLCP has incurred costs and expenses in an amount to be proven at trial; the amount incurred to date is in excess of $1 million.

94.    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately cease all discharges and releases and forthwith characterize and remediate the contamination. The continued commission and omissions of the alleged acts by KACC and DOES 1-100 will irreparably harm MLCP.  MLCP has no speedy or adequate remedy at law for this irreparable harm.

95.    Because MLCP is in part benefiting the People of the State of California by seeking remediation of surface water and groundwater owned by the People, and seeking to benefit and prevent the further impairment of Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property, MLCP requests its attorney's fees pursuant to Section 1021.5 C.C.P.

## SEVENTH CLAIM FOR RELIEF

### Declaratory Relief Alleged Against KACC and DOES 1-100 Pursuant to 28 U.S.C. § 2201 and California Code of Civil Procedure § 1060

96.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive, as though fully set forth herein.

97.    An actual controversy has arisen and now exists between MLCP and KACC and

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  DOES 1-100 concerning their respective rights and duties in that MLCP contends that KACC and

2  DOES 1-100 are responsible both at law and by contract for halting all discharges and releases of

3  contaminants and pollutants, obtaining an NPDES permit, immediately engaging in remedial

4  activities to clean-up the soil, surface waters, and groundwater contamination which MLCP

5  contends KACC and DOES 1-100 have created, reimbursing MLCP for its past costs,

6  compensating MLCP for its damages and losses, and paying any and all costs, fines, and penalties

7  imposed on MLCP or any other third party as a result of the contamination and pollution.  In

8  contrast KACC and DOES 1-100 disputes these contentions and contends that it has no duty at

9  law or by contract to halt discharges and releases or obtain an NPDES permit, remediate the

10  contamination and pollution, reimburse MLCP for its past costs, compensate MLCP for its

11  damages and losses, or pay any costs, fines, and penalties imposed on MLCP or any other third

12  party as a result of the contamination.

13      98.    MLCP desires a judicial determination of its rights and duties, and a declaration as

14  to the liability of KACC and DOES 1-100 under law and pursuant to contract to halt discharges

15  and releases, obtain an NPDES permit, remediate the contamination and pollution, reimburse

16  MLCP for its past costs, compensate MLCP for its damages and losses, and pay any and all costs,

17  fines, and penalties imposed on MLCP or any other third party as a result of the contamination.

18      99.    A judicial determination is appropriate and necessary at this time under the

19  circumstances in order that MLCP may ascertain its rights and duties, be relieved of the financial

20  and other burdens as set forth herein, and receive compensation for the detriment and damages

21  noted.

22      100.   Further, MLCP seeks injunctive relief pursuant to 28 U.S.C. § 2202 and §§ 525 et

23  seq. C.C.P.  MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

24  cease all discharges and releases, obtain an NPDES permit, and forthwith characterize and

25  remediate the contamination and pollution.

26      101.   In addition, MLCP, in bringing this action, acts within the public interest for the

27  protection of the citizens of California by seeking injunctive relief for the purpose of preventing

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

KACC and DOES 1-100 from discharging contaminants and pollutants, polluting soil, surface

waters, and groundwater, and failing to characterize and remediate their contamination.  As such

MLCP requests its attorney's fees pursuant to Section 1021.5 C.C.P., 33 U.S.C. section 1365(d),

and 42 U.S.C. section 6972(e).

## EIGHTH CLAIM FOR RELIEF

### Equitable Indemnity and Contribution Against KACC and DOES 1-100 Pursuant to California Law

102.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive,

as though fully set forth herein.

103.    As a result of the improper use of The Property by KACC and DOES 1-100, the

releases and discharges of contaminants and pollutants from the two dumps, and the improper

acts and omissions of KACC and DOES 1-100 as noted herein, MLCP has suffered and will

continue to suffer liability, damages, costs, and expenses for which MLCP is entitled to

indemnification and contribution from KACC and DOES 1-100 in an amount according to proof,

but not less than $1 million.

104.    Accordingly, MLCP is entitled to indemnity and contribution from KACC and

DOES 1-100 for all liabilities, claims, damages, costs, and expenses, as set forth herein, in an

amount to be proven at trial, but not less than $1 million.

## NINTH CLAIM FOR RELIEF

### Section 1428 California Civil Code Against KACC and DOES 1-100

105.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive,

as though fully set forth herein.

106.    KACC and DOES 1-100 have an obligation at law, pursuant to Section 3479 Civil

Code, Section 5411 Health & Safety Code, 33 U.S.C. section 1311, 33 U.S.C. section 1345, and

42 U.S.C. section 6972(a)(1)(B), among other laws, to (a) not create conditions of contamination

and pollution as a result of its industrial and manufacturing operations, including the creation of

the two dumps in a manner that they discharge and release contaminants and pollutants into the

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  soil, surface waters, and groundwater of The Property; (b) take affirmative steps to obtain an

2  NPDES permit and to prevent the release and discharge of pollutants and contaminants that

3  adversely impact The Property, Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the

4  swamplands in and about The Property; and, (c) characterize and remediate the contamination

5  and pollution that has resulted and is resulting from the two dumps.

6      107.    KACC and DOES 1-100 have failed to undertake and implement its obligations at

7  law.

8      108.    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

9  cease all discharges and releases, obtain an NPDES permit, and forthwith characterize and

10  remediate the contamination and pollution.  The continued commission and omissions of the

11  alleged acts by KACC and DOES 1-100 will irreparably harm MLCP.  MLCP has no speedy or

12  adequate remedy at law for this irreparable harm.

13      109.    Because MLCP is in part benefiting the People of the State of California by

14  seeking remediation of surface water and groundwater owned by the People, and seeking to

15  benefit and prevent the further impairment of Monterey Bay, Moss Landing Harbor, Moro Cojo

16  Slough, and the swamplands in and about The Property, MLCP requests its attorney's fees

17  pursuant to Section 1021.5 C.C.P.

18                        **TENTH CLAIM FOR RELIEF**

19                **Breach of Contract Against KACC and DOES 1-100**

20      110.    MLCP incorporates the allegations set forth in Paragraphs 1 through --, inclusive,

21  as though fully set forth herein.

22      111.    As part of its purchase of The Property from NRMC, MLCP alleges on

23  information and belief that it took assignment of the Agreement for Environmental Compliance.

24  See Exhibit E.

25      112.    MLCP has performed all conditions, covenants, and promises required of its part

26  in accordance with the terms of the Agreement on Environmental Compliance.

27      113.    On or about November 30, 2007 MLCP requested KACC perform its obligations

28

1    under Section 2.5.

2        114.    On information and belief, MLCP alleges that KACC has breached the Agreement

3    by refusing to reimburse MLCP for its costs and expenses.

4        115.    As a result of the breach by KACC, MLCP has incurred costs and expenses that

5    are costs and expenses for which KACC has an obligation to pay 100%. MLCP has been

6    damaged in an amount to be proven at trial, but not less than $1 million.

7                                   **PRAYER FOR RELIEF**

8        Wherefore, MLCP prays for relief against KACC and DOES 1-100 as follows:

9        1.    With respect to the First, Second, Seventh, and Ninth causes of action, for an

10   injunction requiring KACC and DOES 1-100 to obtain an NPDES permit as noted herein and

11   implement the pollution control requirements thereof.

12       2.    With respect to the First through Seventh and Ninth causes of action, for an

13   injunction requiring KACC and DOES 1-100 cease all discharges and releases of contaminants

14   and pollutants, and to characterize and remediate the contamination and pollution as noted herein.

15       3.    With respect to the First, Second, and Third causes of action, for the imposition of

16   civil penalties pursuant to 33 U.S.C. section 1319 and 42 U.S.C. section 6928(g).

17       4.    With respect to the First through Seventh and Ninth causes of action, for costs,

18   including attorney's fees and expert witness fees, pursuant to 33 U.S.C. section 1365(d), 42

19   U.S.C. section 6972(e), and Section 1021.5 California Code of Civil Procedure.

20       5.    With respect to the Seventh Cause of Action, for a declaration that KACC and

21   DOES 1-100 are obligated to halt all discharges and releases of contaminants and pollutants, to

22   obtain an NPDES permit, to characterize and remediate the adverse impact of the contaminants

23   and pollutants, to compensate MLCP for its damages, costs, and losses in an amount to be proven

24   at trial, but not less than $1 million, and to pay any and all costs, fines, and penalties imposed on

25   MLCP or any other third party as a result of the contamination and pollution.

26       6.    With respect to the Fourth through Sixth, Eighth, and Tenth causes of action, for

27   an award for the damages and losses of MLCP in an amount to be proven at trial, but not less than

28

USDC NDCA No.
RCI/5033579.1/CB12                              - 23 -                    COMPLAINT FOR DAMAGES AND
                                                                                INJUNCTIVE RELIEF

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

$1 million.

      7.    For costs of suit incurred herein.

      8.    For prejudgment interest on all damages as authorized by law.

      9.    For such other and further relief as this Court deems just and proper.

Dated:  November 30, 2007          ROPERS, MAJESKI, KOHN & BENTLEY

By: _____
    THOMAS H. CLARKE, JR.
    Attorneys for Plaintiff
    MOSS LANDING COMMERCIAL PARK
    LLC

## DEMAND FOR JURY TRIAL

    Pursuant to FRCP 38(b), MLCP demands a jury trial in this matter.

Dated: November 30, 2007          ROPERS, MAJESKI, KOHN & BENTLEY

By: _____
    THOMAS H. CLARKE, JR.
    TIMOTHY A. DOLAN
    Attorneys for Plaintiff
    MOSS LANDING COMMERCIAL PARK
    LLC

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

USDC NDCA No.
RCI/5033579.1/CB12

- 24 -

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A:

AERIAL PHOTOGRAPH OF AREA SHOWING PROPERTY, SLOUGH, MOSS LANDING

HARBOR AND ENTRY FROM HARBOR INTO MONTEREY BAY

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

USDC NDCA No.
RC1/5033579.1/CB12

- 25 -

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF



1

EXHIBIT B:

2

MAP OF THE BOUNDARIES OF THE MONTEREY BAY NATIONAL MARINE

3

SANCTUARY

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

EXHIBIT C:

DIAGRAM FROM 1981 FILING BY KACC WITH EPA SHOWING THE LOCATION OF

THE TWO DUMPS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

USDC NDCA No.
RC1/5033579.1/CB12

- 27 -

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT D:**

**ATSDR MONOGRAMS ON CHROMIUM, ANTIMONY, NICKEL, AND LEAD**

USDC NDCA No.
RC1/5033579.1/CB12

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco



# ATSDR
AGENCY FOR TOXIC SUBSTANCES
AND DISEASE REGISTRY

# CHROMIUM
## CAS # 7440-47-3

**Division of Toxicology ToxFAQs™**                    **February 2001**

This fact sheet answers the most frequently asked health questions (FAQs) about chromium. For more information, call the ATSDR Information Center at 1-888-422-8737. This fact sheet is one in a series of summaries about hazardous substances and their health effects. It's important you understand this information because this substance may harm you. The effects of exposure to any hazardous substance depend on the dose, the duration, how you are exposed, personal traits and habits, and whether other chemicals are present.

> **HIGHLIGHTS: Exposure to chromium occurs from ingesting contaminated food or drinking water or breathing contaminated workplace air. Chromium(VI) at high levels can damage the nose and can cause cancer. Chromium has been found at 1,036 of the 1,591 National Priority List sites identified by the Environmental Protection Agency (EPA).**

## What is chromium?

Chromium is a naturally occurring element found in rocks, animals, plants, soil, and in volcanic dust and gases. Chromium is present in the environment in several different forms. The most common forms are chromium(0), chromium(III), and chromium(VI). No taste or odor is associated with chromium compounds.

Chromium(III) occurs naturally in the environment and is an essential nutrient. Chromium(VI) and chromium(0) are generally produced by industrial processes.

The metal chromium, which is the chromium(0) form, is used for making steel. Chromium(VI) and chromium(III) are used for chrome plating, dyes and pigments, leather tanning, and wood preserving.

## What happens to chromium when it enters the environment?

❑ Chromium enters the air, water, and soil mostly in the chromium(III) and chromium(VI) forms.
❑ In air, chromium compounds are present mostly as fine dust particles which eventually settle over land and water.
❑ Chromium can strongly attach to soil and only a small amount can dissolve in water and move deeper in the soil to underground water.
❑ Fish do not accumulate much chromium in their bodies from water.

## How might I be exposed to chromium?

❑ Eating food containing chromium(III).
❑ Breathing contaminated workplace air or skin contact during use in the workplace.
❑ Drinking contaminated well water.
❑ Living near uncontrolled hazardous waste sites containing chromium or industries that use chromium.

## How can chromium affect my health?

Chromium(III) is an essential nutrient that helps the body use sugar, protein, and fat.

Breathing high levels of chromium(VI) can cause irritation to the nose, such as runny nose, nosebleeds, and ulcers and holes in the nasal septum.

Ingesting large amounts of chromium(VI) can cause stomach upsets and ulcers, convulsions, kidney and liver damage, and even death.

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, Public Health Service**
Agency for Toxic Substances and Disease Registry

**Page 2**

# CHROMIUM
## CAS # 7440-47-3

Skin contact with certain chromium(VI) compounds can cause skin ulcers. Some people are extremely sensitive to chromium(VI) or chromium(III). Allergic reactions consisting of severe redness and swelling of the skin have been noted.

### How likely is chromium to cause cancer?

Several studies have shown that chromium(VI) compounds can increase the risk of lung cancer. Animal studies have also shown an increased risk of cancer.

The World Health Organization (WHO) has determined that chromium(VI) is a human carcinogen.

The Department of Health and Human Services (DHHS) has determined that certain chromium(VI) compounds are known to cause cancer in humans.

The EPA has determined that chromium(VI) in air is a human carcinogen.

### How can chromium affect children?

We do not know if exposure to chromium will result in birth defects or other developmental effects in people. Birth defects have been observed in animals exposed to chromium(VI).

It is likely that health effects seen in children exposed to high amounts of chromium will be similar to the effects seen in adults.

### How can families reduce the risk of exposure to chromium?

❑ Children should avoid playing in soils near uncontrolled hazardous waste sites where chromium may have been discarded.

❑ Although chromium(III) is an essential nutrient, you should avoid excessive use of dietary supplements containing chromium.

### Is there a medical test to show whether I've been exposed to chromium?

Since chromium(III) is an essential element and naturally occurs in food, there will always be some level of chromium in your body. There are tests to measure the level of chromium in hair, urine, and blood. These tests are most useful for people exposed to high levels. These tests cannot determine the exact levels of chromium that you may have been exposed to or predict how the levels in your tissues will affect your health.

### Has the federal government made recommendations to protect human health?

EPA has set a limit of 100 μg chromium(III) and chromium(VI) per liter of drinking water (100 μg/L).

The Occupational Safety and Health Administration (OSHA) has set limits of 500 μg water soluble chromium(III) compounds per cubic meter of workplace air (500 μg/m³), 1,000 μg/m³ for metallic chromium(0) and insoluble chromium compounds, and 52 μg/m³ for chromium(VI) compounds for 8-hour work shifts and 40-hour work weeks.

### References

Agency for Toxic Substances and Disease Registry (ATSDR). 2000. Toxicological Profile for Chromium. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.

---

**Where can I get more information?**    For more information, contact the Agency for Toxic Substances and Disease Registry, Division of Toxicology, 1600 Clifton Road NE, Mailstop F-32, Atlanta, GA  30333. Phone: 1-888-422-8737, FAX: 770-488-4178. ToxFAQs™ Internet address is http://www.atsdr.cdc.gov/toxfaq.html . ATSDR can tell you where to find occupational and environmental health clinics. Their specialists can recognize, evaluate, and treat illnesses resulting from exposure to hazardous substances. You can also contact your community or state health or environmental quality department if you have any more questions or concerns.





# ATSDR
AGENCY FOR TOXIC SUBSTANCES
AND DISEASE REGISTRY

# ANTIMONY
# CAS # 7440-36-0

**Agency for Toxic Substances and Disease Registry ToxFAQs**          **September 1995**

This fact sheet answers the most frequently asked health questions (FAQs) about antimony. For more information, call the ATSDR Information Center at 1-888-422-8737. This fact sheet is one in a series of summaries about hazardous substances and their health effects. This information is important because this substance may harm you. The effects of exposure to any hazardous substance depend on the dose, the duration, how you are exposed, personal traits and habits, and whether other chemicals are present.

**SUMMARY: Exposure to antimony occurs in the workplace or from skin contact with soil at hazardous waste sites. Breathing high levels of antimony for a long time can irritate the eyes and lungs, and can cause problems with the lungs, heart, and stomach. This chemical has been found in at least 403 of 1,416 National Priorities List sites identified by the Environmental Protection Agency.**

## What is antimony?
(Pronounced ăn′tə-mō′nē)

Antimony is a silvery-white metal that is found in the earth's crust. Antimony ores are mined and then mixed with other metals to form antimony alloys or combined with oxygen to form antimony oxide.

Little antimony is currently mined in the United States. It is brought into this country from other countries for processing. However, there are companies in the United States that produce antimony as a by-product of smelting lead and other metals.

Antimony isn't used alone because it breaks easily, but when mixed into alloys, it is used in lead storage batteries, solder, sheet and pipe metal, bearings, castings, and pewter. Antimony oxide is added to textiles and plastics to prevent them from catching fire. It is also used in paints, ceramics, and fireworks, and as enamels for plastics, metal, and glass.

## What happens to antimony when it enters the environment?

- Antimony is released to the environment from natural sources and from industry.
- In the air, antimony is attached to very small particles that may stay in the air for many days.
- Most antimony ends up in soil, where it attaches strongly to particles that contain iron, manganese, or aluminum.
- Antimony is found at low levels in some rivers, lakes, and streams.

## How might I be exposed to antimony?

- Because antimony is found naturally in the environment, the general population is exposed to low levels of it every day, primarily in food, drinking water, and air.
- It may be found in air near industries that process or release it, such as smelters, coal-fired plants, and refuse incinerators.
- In polluted areas containing high levels of antimony, it may be found in the air, water, and soil.
- Workers in industries that process it or use antimony ore may be exposed to higher levels.

## How can antimony affect my health?

Exposure to antimony at high levels can result in a variety of adverse health effects.

Breathing high levels for a long time can irritate your eyes and lungs and can cause heart and lung problems, stomach pain, diarrhea, vomiting, and stomach ulcers.

In short-term studies, animals that breathed very high levels of antimony died. Animals that breathed high levels

# ANTIMONY
## CAS # 7440-36-0

had lung, heart, liver, and kidney damage. In long-term studies, animals that breathed very low levels of antimony had eye irritation, hair loss, lung damage, and heart problems. Problems with fertility were also noted. In animal studies, problems with fertility have been seen when rats breathed very high levels of antimony for a few months.

Ingesting large doses of antimony can cause vomiting. We don't know what other effects may be caused by ingesting it. Long-term animal studies have reported liver damage and blood changes when animals ingested antimony. Antimony can irritate the skin if it is left on it.

Antimony can have beneficial effects when used for medical reasons. It has been used as a medicine to treat people infected with parasites.

## How likely is antimony to cause cancer?

The Department of Health and Human Services, the International Agency for Research on Cancer, and the Environmental Protection Agency (EPA) have not classified antimony as to its human carcinogenicity.

Lung cancer has been observed in some studies of rats that breathed high levels of antimony. No human studies are available. We don't know whether antimony will cause cancer in people.

## Is there a medical test to show whether I've been exposed to antimony?

Tests are available to measure antimony levels in the body. Antimony can be measured in the urine, feces, and blood for several days after exposure. However, these tests cannot tell you how much antimony you have been exposed to or whether you will experience any health effects. Some tests are not usually performed in most doctors' offices and may require special equipment to conduct them.

## Has the federal government made recommendations to protect human health?

The EPA allows 0.006 parts of antimony per million parts of drinking water (0.006 ppm). The EPA requires that discharges or spills into the environment of 5,000 pounds or more of antimony be reported.

The Occupational Safety and Health Administration (OSHA) has set an occupational exposure limit of 0.5 milligrams of antimony per cubic meter of air (0.5 mg/m$^3$) for an 8-hour workday, 40-hour workweek.

The American Conference of Governmental Industrial Hygienists (ACGIH) and the National Institute for Occupational Safety and Health (NIOSH) currently recommend the same guidelines for the workplace as OSHA.

## Glossary

Carcinogenicity: Ability to cause cancer.
CAS: Chemical Abstracts Service.
Ingestion: Taking food or drink into your body.
Long-term: Lasting one year or more.
Milligram (mg): One thousandth of a gram.
Parasite: An organism living in or on another organism.
ppm: Parts per million.
Short-term: Lasting 14 days or less.

## References

Agency for Toxic Substances and Disease Registry (ATSDR). 1992. Toxicological profile for antimony. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.

---

**Where can I get more information?**  For more information, contact the Agency for Toxic Substances and Disease Registry, Division of Toxicology, 1600 Clifton Road NE, Mailstop F-32, Atlanta, GA 30333. Phone: 1-888-422-8737, FAX: 770-488-4178. ToxFAQs Internet address via WWW is http://www.atsdr.cdc.gov/toxfaq.html  ATSDR can tell you where to find occupational and environmental health clinics. Their specialists can recognize, evaluate, and treat illnesses resulting from exposure to hazardous substances. You can also contact your community or state health or environmental quality department if you have any more questions or concerns.



# NICKEL

## CAS # 7440-02-0

AGENCY FOR TOXIC SUBSTANCES
AND DISEASE REGISTRY

Division of Toxicology ToxFAQs™                                                    August 2005

This fact sheet answers the most frequently asked health questions (FAQs) about nickel. For more information, call the ATSDR Information Center at 1-888-422-8737. This fact sheet is one in a series of summaries about hazardous substances and their health effects. It is important you understand this information because this substance may harm you. The effects of exposure to any hazardous substance depend on the dose, the duration, how you are exposed, personal traits and habits, and whether other chemicals are present.

> **HIGHLIGHTS:** Nickel is a naturally occurring element. Pure nickel is a hard, silvery-white metal used to make stainless steel and other metal alloys. Skin effects are the most common effects in people who are sensitive to nickel. Workers who breathed very large amounts of nickel compounds developed chronic bronchitis and lung and nasal sinus cancers. Nickel has been found in at least 882 of the 1,662 National Priority List sites identified by the Environmental Protection Agency (EPA).

## What is nickel?

Nickel is a very abundant natural element. Pure nickel is a hard, silvery-white metal. Nickel can be combined with other metals, such as iron, copper, chromium, and zinc, to form alloys. These alloys are used to make coins, jewelry, and items such as valves and heat exchangers. Most nickel is used to make stainless steel.

Nickel can combine with other elements such as chlorine, sulfur, and oxygen to form nickel compounds. Many nickel compounds dissolve fairly easy in water and have a green color. Nickel compounds are used for nickel plating, to color ceramics, to make some batteries, and as substances known as catalysts that increase the rate of chemical reactions. Nickel is found in all soil and is emitted from volcanoes. Nickel is also found in meteorites and on the ocean floor. Nickel and its compounds have no characteristic odor or taste.

## What happens to nickel when it enters the environment?

❏ Nickel is released into the atmosphere by industries that make or use nickel, nickel alloys, or nickel compounds. It is also released into the atmosphere by oil-burning power plants, coal-burning power plants, and trash incinerators.
❏ In the air, it attaches to small particles of dust that settle to the ground or are taken out of the air in rain or snow; this usually takes many days.

❏ Nickel released in industrial waste water ends up in soil or sediment where it strongly attaches to particles containing iron or manganese.
❏ Nickel does not appear to accumulate in fish or in other animals used as food.

## How might I be exposed to nickel?

❏ By eating food containing nickel, which is the major source of exposure for most people.
❏ By skin contact with soil, bath or shower water, or metals containing nickel, as well as by handling coins or touching jewelry containing nickel.
❏ By drinking water that contains small amounts of nickel.
❏ By breathing air or smoking tobacco containing nickel.
❏ Higher exposure may occur if you work in industries that process or use nickel.

## How can nickel affect my health?

The most common harmful health effect of nickel in humans is an allergic reaction. Approximately 10-20% of the population is sensitive to nickel. People can become sensitive to nickel when jewelry or other things containing it are in direct contact with the skin for a long time. Once a person is sensitized to nickel, further contact with the metal may produce a reaction. The most common reaction is a skin rash at the site of contact. The skin rash may also

**Page 2**

# NICKEL
## CAS # 7440-02-0

occur at a site away from the site of contact. Less frequently, some people who are sensitive to nickel have asthma attacks following exposure to nickel. Some sensitized people react when they consume food or water containing nickel or breathe dust containing it.

People working in nickel refineries or nickel-processing plants have experienced chronic bronchitis and reduced lung function. These persons breathed amounts of nickel much higher than levels found normally in the environment. Workers who drank water containing high amounts of nickel had stomach ache and suffered adverse effects to their blood and kidneys.

Damage to the lung and nasal cavity has been observed in rats and mice breathing nickel compounds. Eating or drinking large amounts of nickel has caused lung disease in dogs and rats and has affected the stomach, blood, liver, kidneys, and immune system in rats and mice, as well as their reproduction and development.

## How likely is nickel to cause cancer?

Cancers of the lung and nasal sinus have resulted when workers breathed dust containing high levels of nickel compounds while working in nickel refineries or nickel processing plants. The Department of Health and Human Services (DHHS) has determined that nickel metal may reasonably be anticipated to be a carcinogen and that nickel compounds are known human carcinogens. The International Agency for Research on Cancer (IARC) has determined that some nickel compounds are carcinogenic to humans and that metallic nickel may possibly be carcinogenic to humans. The EPA has determined that nickel refinery dust and nickel subsulfide are human carcinogens.

## How can nickel affect children?

It is likely that the health effects seen in children exposed to nickel will be similar to those seen in adults. We do not know whether children differ from adults in their susceptibility to nickel. Human studies that examined whether nickel can harm the fetus are inconclusive. Animal studies have found increases in newborn deaths and decreased newborn weight after ingesting very high amounts of nickel. Nickel can be transferred from the mother to an infant in breast milk and can cross the placenta.

## How can families reduce the risks of exposure to nickel?

❑ Avoiding jewelry containing nickel will eliminate risks of exposure to this source of the metal.
❑ Exposures of the general population from other sources, such as foods and drinking water, are almost always too low to be of concern.

## Is there a medical test to determine whether I've been exposed to nickel?

There are tests available to measure nickel in your blood, feces, and urine. More nickel was measured in the urine of workers who were exposed to nickel compounds that dissolve easily in water than in the urine of workers exposed to nickel compounds that are hard to dissolve. This means that it is easier to tell if you have been exposed to soluble nickel compounds than less-soluble compounds. The nickel measurements do not accurately predict potential health effects from exposure to nickel.

## Has the federal government made recommendations to protect human health?

The EPA recommends that drinking water should contain no more than 0.1 milligrams of nickel per liter of water (0.1 mg/L). To protect workers, the Occupational Safety and Health Administration (OSHA) has set a limit of 1 mg of nickel per cubic meter of air (1 mg/m$^3$) for metallic nickel and nickel compounds in workplace air during an 8-hour workday, 40-hour workweek.

## References

Agency for Toxic Substances and Disease Registry (ATSDR). 2005. Toxicological Profile for Nickel (Update). Atlanta, GA: U.S. Department of Public Health and Human Services, Public Health Service.

**Where can I get more information?** For more information, contact the Agency for Toxic Substances and Disease Registry, Division of Toxicology, 1600 Clifton Road NE, Mailstop F-32, Atlanta, GA 30333. Phone: 1-888-422-8737, FAX: 770-488-4178. ToxFAQs Internet address via WWW is http://www.atsdr.cdc.gov/toxfaq.html. ATSDR can tell you where to find occupational and environmental health clinics. Their specialists can recognize, evaluate, and treat illnesses resulting from exposure to hazardous substances. You can also contact your community or state health or environmental quality department if you have any more questions or concerns.





# ATSDR

**AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY**

# LEAD

## CAS # 7439-92-1

**Division of Toxicology and Environmental Medicine ToxFAQs™**                    **August 2007**

This fact sheet answers the most frequently asked health questions (FAQs) about lead. For more information, call the ATSDR Information Center at 1-800-232-4636. This fact sheet is one in a series of summaries about hazardous substances and their health effects. It is important you understand this information because this substance may harm you. The effects of exposure to any hazardous substance depend on the dose, the duration, how you are exposed, personal traits and habits, and whether other chemicals are present.

> **HIGHLIGHTS:** Exposure to lead can happen from breathing workplace air or dust, eating contaminated foods, or drinking contaminated water. Children can be exposed from eating lead-based paint chips or playing in contaminated soil. Lead can damage the nervous system, kidneys, and reproductive system. Lead has been found in at least 1,272 of the 1,684 National Priority List sites identified by the Environmental Protection Agency (EPA).

## What is lead?

Lead is a naturally occurring bluish-gray metal found in small amounts in the earth's crust. Lead can be found in all parts of our environment. Much of it comes from human activities including burning fossil fuels, mining, and manufacturing.

Lead has many different uses. It is used in the production of batteries, ammunition, metal products (solder and pipes), and devices to shield X-rays. Because of health concerns, lead from paints and ceramic products, caulking, and pipe solder has been dramatically reduced in recent years. The use of lead as an additive to gasoline was banned in 1996 in the United States.

## What happens to lead when it enters the environment?

❑ Lead itself does not break down, but lead compounds are changed by sunlight, air, and water.
❑ When lead is released to the air, it may travel long distances before settling to the ground.
❑ Once lead falls onto soil, it usually sticks to soil particles.
❑ Movement of lead from soil into groundwater will depend on the type of lead compound and the characteristics of the soil.

## How might I be exposed to lead?

❑ Eating food or drinking water that contains lead. Water pipes in some older homes may contain lead solder. Lead can leach out into the water.

❑ Spending time in areas where lead-based paints have been used and are deteriorating. Deteriorating lead paint can contribute to lead dust.
❑ Working in a job where lead is used or engaging in certain hobbies in which lead is used, such as making stained glass.
❑ Using health-care products or folk remedies that contain lead.

## How can lead affect my health?

The effects of lead are the same whether it enters the body through breathing or swallowing. Lead can affect almost every organ and system in your body. The main target for lead toxicity is the nervous system, both in adults and children. Long-term exposure of adults can result in decreased performance in some tests that measure functions of the nervous system. It may also cause weakness in fingers, wrists, or ankles. Lead exposure also causes small increases in blood pressure, particularly in middle-aged and older people and can cause anemia. Exposure to high lead levels can severely damage the brain and kidneys in adults or children and ultimately cause death. In pregnant women, high levels of exposure to lead may cause miscarriage. High-level exposure in men can damage the organs responsible for sperm production.

## How likely is lead to cause cancer?

We have no conclusive proof that lead causes cancer in humans. Kidney tumors have developed in rats and mice that had been given large doses of some kind of lead compounds. The Department of Health and Human Services

**Page 2**

# LEAD
## CAS # 7439-92-1

(DHHS) has determined that lead and lead compounds are reasonably anticipated to be human carcinogens and the EPA has determined that lead is a probable human carcinogen. The International Agency for Research on Cancer (IARC) has determined that inorganic lead is probably carcinogenic to humans and that there is insufficient information to determine whether organic lead compounds will cause cancer in humans.

## How can lead affect children?

Small children can be exposed by eating lead-based paint chips, chewing on objects painted with lead-based paint, or swallowing house dust or soil that contains lead.

Children are more vulnerable to lead poisoning than adults. A child who swallows large amounts of lead may develop blood anemia, severe stomachache, muscle weakness, and brain damage. If a child swallows smaller amounts of lead, much less severe effects on blood and brain function may occur. Even at much lower levels of exposure, lead can affect a child's mental and physical growth.

Exposure to lead is more dangerous for young and unborn children. Unborn children can be exposed to lead through their mothers. Harmful effects include premature births, smaller babies, decreased mental ability in the infant, learning difficulties, and reduced growth in young children. These effects are more common if the mother or baby was exposed to high levels of lead. Some of these effects may persist beyond childhood.

## How can families reduce the risks of exposure to lead?

❑  Avoid exposure to sources of lead.

❑  Do not allow children to chew or mouth surfaces that may have been painted with lead-based paint.

❑  If you have a water lead problem, run or flush water that has been standing overnight before drinking or cooking with it.

❑  Some types of paints and pigments that are used as make-up or hair coloring contain lead. Keep these kinds of products away from children

❑  If your home contains lead-based paint or you live in an area contaminated with lead, wash children's hands and faces often to remove lead dusts and soil, and regularly clean the house of dust and tracked in soil.

## Is there a medical test to determine whether I've been exposed to lead?

A blood test is available to measure the amount of lead in your blood and to estimate the amount of your recent exposure to lead. Blood tests are commonly used to screen children for lead poisoning. Lead in teeth or bones can be measured by X-ray techniques, but these methods are not widely available. Exposure to lead also can be evaluated by measuring erythrocyte protoporphyrin (EP) in blood samples. EP is a part of red blood cells known to increase when the amount of lead in the blood is high. However, the EP level is not sensitive enough to identify children with elevated blood lead levels below about 25 micrograms per deciliter ($\mu g/dL$). These tests usually require special analytical equipment that is not available in a doctor's office. However, your doctor can draw blood samples and send them to appropriate laboratories for analysis.

## Has the federal government made recommendations to protect human health?

The Centers for Disease Control and Prevention (CDC) recommends that states test children at ages 1 and 2 years. Children should be tested at ages 3–6 years if they have never been tested for lead, if they receive services from public assistance programs for the poor such as Medicaid or the Supplemental Food Program for Women, Infants, and Children, if they live in a building or frequently visit a house built before 1950; if they visit a home (house or apartment) built before 1978 that has been recently remodeled; and/or if they have a brother, sister, or playmate who has had lead poisoning. CDC considers a blood lead level of 10 $\mu g/dL$ to be a level of concern for children.

EPA limits lead in drinking water to 15 $\mu g$ per liter.

## References

Agency for Toxic Substances and Disease Registry (ATSDR). 2007. Toxicological Profile for lead (Update). Atlanta, GA: U.S. Department of Public Health and Human Services, Public Health Service.

**Where can I get more information?**  For more information, contact the Agency for Toxic Substances and Disease Registry, Division of Toxicology and Environmental Medicine, 1600 Clifton Road NE, Mailstop F-32, Atlanta, GA 30333. Phone: 1-800-232-4636, FAX: 770-488-4178.  ToxFAQs Internet address via WWW is http://www.atsdr.cdc.gov/toxfaq.html.  ATSDR can tell you where to find occupational and environmental health clinics. Their specialists can recognize, evaluate, and treat illnesses resulting from exposure to hazardous substances.  You can also contact your community or state health or environmental quality department if you have any more questions or concerns.

EXHIBIT E:

COPY OF THE AGREEMENT ON ENVIRONMENTAL COMPLIANCE

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

USDC NDCA No.
RC1/5033579.1/CB12

- 29 -

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

## AGREEMENT ON ENVIRONMENTAL COMPLIANCE

This Agreement on Environmental Compliance ("Agreement") is made this 31st day of December 1984 among National Refractories Holding Co., a Delaware corporation, National Refractories & Minerals Corporation, a California corporation, and 601725 Ontario Ltd., incorporated in Ontario, Canada, all with offices at 300 Lakeside Drive, Oakland, California 94643 (collectively referred to as "Buyers"), and Kaiser Aluminum & Chemical Corporation, a Delaware Corporation, Kaiser Agricultural Chemicals Corporation, a Delaware Corporation, and Kaiser Aluminum & Chemical of Canada Limited, incorporated in Nova Scotia, Canada, all with offices at 300 Lakeside Drive, Oakland, California 94643 (collectively referred to as "Sellers").

## WITNESSETH:

WHEREAS, Buyers and Sellers have entered into an Asset Purchase Agreement, of even date ("Asset Purchase Agreement") under which Buyers have agreed to purchase and Sellers have agreed to sell certain assets and properties ("Assets") on the Closing date as "Closing" is defined in the Asset Purchase Agreement;

WHEREAS, Clause 4.2 of said Asset Purchase Agreement provides that: "All environmental, operating, use and other permits, exceptions to zoning laws or other such rights relating to the Assets in any way whatsoever shall, to the extent transferable, accompany the Lease and assignments of leases of the Real Property and Equipment to Buyers and Sellers and Buyers will execute such assignments and assumptions as may be required to transfer such rights to Buyers. Buyers and Sellers shall cooperate to obtain the consents of all parties required in connection with the assignment or transfer of such permits. All obligations to be performed and all conditions to be met under any such permit shall, after Closing, be the responsibility and obligation of Buyers."

WHEREAS, Clause 4.11 of said Asset Purchase Agreement provides that: "Subject to the provisions of the Agreement on Environmental Compliance to be entered into on the Closing date, Sellers shall retain all liability imposed on Sellers by federal, state or local law or regulation for damages to the environment as a result of events occurring prior to the Closing or for failure prior to the Closing to comply with any federal, state or local law relating to the environment."

WHEREAS, Clause 10.1 of said Asset Purchase Agreement provides that Buyers and one or more of the other parties to the Asset Purchase Agreement shall enter into an "Agreement on Environmental Compliance";

2

WHEREAS, Clauses 15.2, 15.3, 15.4 and 15.5 of said Asset Purchase Agreement provide for indemnity by Sellers and indemnity by Buyers for matters covered by the Asset Purchase Agreement.

NOW THEREFORE, the parties hereto agree as follows:

ARTICLE 1. – Responsibility

1.1  After Closing the respective responsibilities of Buyers and Sellers for environmental hazard, damage, condition or regulatory non-compliance arising out of or in connection with ownership and operation of the Assets shall be governed by the provisions of the Asset Purchase Agreement and this Agreement.

1.2  Except as otherwise provided in this Agreement, Sellers shall retain all liability imposed by Federal, state, provincial or local law or regulation, and resulting from third party legal actions, for (a) penalties and damages or claims for damages to the environment resulting from events which occurred prior to Closing, (b) Sellers' failure or alleged failure prior to Closing to comply with Federal, state, provincial or local laws or regulations relating to the environment, and (c) remedial actions required by governmental authorities to rectify such pre-Closing events or regulatory non-compliance, such as removing, treating or disposing of any contaminants or bringing the surface or subsurface of land comprising the Assets into compliance with regulatory requirements. Buyers shall be liable for all such matters resulting from events and regulatory

3

non-compliance which occur after Closing. Buyers and Sellers shall share the costs in proportion to their respective liabilities in cases where damages or required remedial actions address events or regulatory non-compliance occurring both before and after Closing.

1.3 Buyers shall promptly notify Sellers in writing of any claim or threatened claim for environmental damage or penalty, or any demand or threatened demand by regulatory authorities for remedial action, which Buyers assert to be Sellers' responsibility under the terms of this Agreement. In such cases Sellers shall have the right, acting in good faith and without unnecessary delay, to contest such claim or demand at its own expense with counsel of its choice, or to negotiate the terms of remedial action. Buyers shall have the right to participate in any such litigation or contest at its own expense with counsel of their choice. If Sellers do not promptly exercise their right to litigate or contest such claim or demand, Buyers shall have the right, acting in good faith and without unnecessary delay, to litigate or contest such claim at its own expense with counsel of their choice. If it is subsequently determined that Sellers have refused to assume the defense of a claim or demand for which they had liability under this Agreement, the cost of defense of such claim borne by Buyers shall constitute an additional liability for which Sellers shall be obligated. Buyers and Sellers shall cooperate fully in the defense of any such litigation or contest or the negotiation of a remedial action plan, and each shall keep each other advised of the progress and disposition thereof.

ARTICLE 2. - <u>Permits; Remedial Action</u>

2.1  Buyers are purchasing the Assets for the purpose of conducting a refractories manufacturing business.  Pursuant to the Asset Purchase Agreement, <u>Sellers have agreed</u> to assign and Buyers have agreed to assume as of Closing (to the extent permitted by law) all permits, including air, water and waste discharge, use, operating and mining permits, associated with the Assets (the "Permits").  To the extent any such Permits cannot be assigned, Buyers shall promptly apply for replacement Permits in Buyers' name.

2.2  A list of Permits associated with the Assets which are to be assigned to Buyers by Sellers or replaced by Buyers is attached hereto as Exhibit A.

2.3  For commercial activities and uses of the Assets other than mining and processing refractory raw materials and related non-metallic minerals, and manufacturing refractory and related products, Buyers shall pay all costs associated with (a) transferring existing and obtaining new Permits, (b) carrying out environmental monitoring, sampling, analysis, remedial planning and similar activities which are required as conditions of all Permits, and (c) performing all environmental remedial work.

2.4  For commercial activities and uses of the Assets in mining and processing refractory raw materials and related non-metallic minerals, and manufacturing refractory and related products:

2.4.1  all costs associated with transferring existing and obtaining new Permits shall be paid by Buyers; and

5

2.4.2  all costs of carrying out environmental monitoring, sampling, analysis, remedial planning and similar activities which are required as conditions of all Permits with respect to environmental hazards or potential hazards which existed prior to December 31, 1984, shall be shared by Buyers and Sellers as follows:

(a)  for calendar years 1985 through 1989, Sellers shall reimburse Buyers for one hundred percent (100%) of all such costs incurred at Moss Landing during those years;

(b)  for calendar years 1990 through 1999 at Moss Landing, and for calendar years 1985 through 1994 at all other plant locations included in the Assets, Sellers shall reimburse Buyers fifty percent (50%) of the first $2,000,000 aggregate per year of all such costs incurred by Buyers, and one hundred percent (100%) of any balance in excess of $2,000,000.

2.5  The costs of remedial action (including monitoring, sampling, analysis, remedial planning and similar activities which are required on a permanent basis) with respect to environmental hazards or potential hazards which existed on or prior to December 31, 1984, shall be shared by Buyers and Sellers as follows:

2.5.1  except in the case of an expansion at Moss Landing as covered in Section 2.5.2 below, Sellers shall reimburse Buyers for one hundred percent (100%) of such costs at all plant locations;

6

2.5.2  where such remedial costs are incurred in connection with an expansion at Moss Landing, Sellers shall reimburse Buyers fifty percent (50%) of the first $2,000,000 of such costs, and one hundred percent (100%) of costs above $2,000,000.  An "expansion" for this purpose shall mean the construction of facilities involving a significant change in the scope of current operations or in the existing capacity of the facilities as of December 31, 1984 (excluding modernization or optimization of such facilities).

2.6  At regular intervals to be agreed upon by the parties, Buyers shall furnish Sellers invoices itemizing amounts owed pursuant to this Article 2.  Payment shall be due thirty (30) days from date of invoice.  Buyers' costs used in calculating invoices shall be subject to audit at reasonable intervals.

ARTICLE 3. – Buyers Obligations

3.1  Buyers covenant and agree as follows:

3.1.1  At Moss Landing –

(a)  to maintain the existing closed brick plant waste dumps including the Dolan Road embankment. This includes all ordinary maintenance, patching, and similar repairs, but not such extraordinary maintenance as replacement of the existing surface covers at the end of their useful lives;

(b)  to reroute storm drains around the dump and to close off the present drain; and

7

    (c)  to maintain the leachate collection system and continue to process leachate as presently processed for so long as a hazardous waste processing permit is not required for this process.

3.1.2  At all locations –

    (a)  to avoid taking actions in areas of the Assets which Buyers knew or should have known were used prior to December 31, 1984, for the subsurface disposal of waste materials, which actions would trigger Sellers' liability or increase the scope of Sellers' liability.  Such areas shall be designated in writing by mutual agreement of Buyers and Sellers.  Notwithstanding any provisions of this Agreement to the contrary, all liability resulting from such actions shall be for Buyers' account.  "Actions" for this purpose (i) include accidents, willful or negligent acts or omissions, and failure to observe the provisions of this Agreement, and (ii) exclude permit applications for operations filed in the ordinary course of business;

    (b)  to keep Sellers fully and promptly informed of any claim or threatened claim for damages, or any demand by any governmental authority for remedial action for the removal, treatment or disposal of any contaminants from the surface or subsurface of any land purchased as a part of the Assets for which Sellers may be wholly or partially responsible;

    (c)  to cooperate with Sellers (i) in developing and securing approval for remedial actions which utilize the

8

least-cost alternatives acceptable to the regulatory authorities requiring the remedial action, and (ii) implementing all required and appropriate remedial action. In developing and implementing such least-cost alternatives, good faith efforts will be made to minimize interference with Buyers' operations.

ARTICLE 4. - Reclamation

4.1  Except as set forth in Section 4.2 below, Buyers shall be solely responsible for the performance of all reclamation work that may be required on or in connection with any real property forming a part of the Assets, including implementation of the reclamation plan for Natividad as set forth in Use Permit No. 2970 issued by the Planning Commission of Monterey County, California (the "Natividad Use Permit").

4.2  If as a consequence of any state or Federal reclamation legislation which is enacted after December 31, 1984, (i) the Natividad Use Permit is either revoked or mandatorily revised prior to December 31, 1989, and (ii) as a result of such revocation or revision Buyers necessarily incur increased reclamation costs at Natividad over those costs which would otherwise have been incurred under the Natividad Use Permit, Sellers shall reimburse Buyers for fifty percent (50%) of the first $6,000,000 in such cost increases. Aggregated incremental cost increases above $6,000,000 shall be entirely for Buyers' account.

9

4.3 If Sellers shall pay any amounts to Buyers pursuant to Section 4.2, and if Buyers have as a consequence of the enactment of any such legislation and resulting permit revocation or revision any right to damages for condemnation, inverse condemnation, or the like, Buyers and Sellers shall jointly pursue such rights and shall share in any recovery on the same basis as they shared in the incremental cost increases in accordance with Section 4.2.

ARTICLE 5. – Offsite Disposal Claims

Sellers shall be responsible for any claims by third parties arising out of or in connection with Seller' disposal prior to Closing of hazardous or non-hazardous wastes on property which is not part of the Assets.

ARTICLE 6. – Indemnity

6.1 Buyers shall indemnify, defend and hold harmless Sellers from and against all demands, claims, actions or causes of action, assessments, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses (collectively, "Damages"), asserted against, imposed upon or incurred by Sellers by reason of or resulting from any failure of Buyers to comply with the responsibility and obligation of Buyers assumed under Articles 1, 2, 3, and 4 of this Agreement.

10

6.2 Sellers shall indemnify, defend and hold harmless Buyers from and against all demands, claims, actions or causes of action, assessments, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses (collectively, "Damages"), asserted against, imposed upon or incurred by Buyers by reason of or resulting from any failure of Sellers to comply with the responsibility and obligation of Sellers assumed under Articles 1, 2, 4, and 5 of this Agreement.


ARTICLE 7. - <u>Miscellaneous</u>


7.1 <u>Notices</u>. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or upon receipt, if transmitted by telecommunication or wire, and properly addressed as follows:

    (a)  to Sellers at the address above first written;

        Attention:    Mr. W. R. Linn
                     KB 1445

        with copy to:  Mr. D. L. Perry
                     Vice President and General Counsel
                     Kaiser Aluminum & Chemical Corporation
                     300 Lakeside Drive
                     Oakland, CA  94643

    (b)  to Buyers at the address above first written;

        Attention:    Mr. Charles C. Smith
                     KB 1460

11

with copy to:  Mr. Brian J. McCarthy
Skadden, Arps, Slate, Meagher & Flom
515 South Figueroa Street
Los Angeles, CA 90071

Any party may change its address for purposes of this Article by giving the other parties written notice of the new address in the manner set forth above.

7.2  <u>Governing Law</u>. This Agreement shall be construed in accordance with, and governed by, the laws of the State of California.

7.3  <u>Assignment</u>. No party hereto shall assign this Agreement or any part thereof without the prior written consent of the other parties. Except as otherwise provided herein, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.4  <u>No Third Party Beneficiaries</u>. Nothing in this Agreement shall entitle any person other than the parties hereto and their respective successors and permitted assigns to any claim, cause of action, remedy or right of any kind.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the day and year first above written.

NATIONAL REFRACTORIES HOLDING CO.

By: _____

NATIONAL REFRACTORIES & MINERALS
CORPORATION

By: _____

601725 ONTARIO LTD.

By: _____

KAISER ALUMINUM & CHEMICAL CORPORATION

By: _____

KAISER AGRICULTURAL CHEMICALS
CORPORATION

By: _____

KAISER ALUMINUM & CHEMICAL OF CANADA
LIMITED

By: _____